## LAMPKIN v. LAMPKIN.

Court of Appeals of Kentucky.
Dec. 19, 1952.

As Modified on Denial of Rehearing
June 12, 1953.

Arthur Grafton, Wyatt, Grafton & Grafton, Louisville, J. W. Salisbury, Palm Beach, Fla., for appellant.

Woodward, Hobson & Fulton, Louisville, for appellee.

WADDILL, Commissioner.

Lucina Smith Lampkin appeals from a judgment which granted her husband, Eustace F. Lampkin, a divorce, denied her claim for alimony and upheld a written property settlement agreement between them.

Appellant contends that the court did not have jurisdiction to render a decree of divorce; that the settlement agreement which she executed was unfairly obtained from her and against public policy and should be set aside; and that she should be awarded alimony.

The record reflects that on July 15, 1949, appellee filed suit in the Henderson Circuit Court seeking a divorce from appellant on the statutory grounds of abandonment. KRS 403.020(2)(a). The petition stated that they have no children and have settled their property rights and it contained other averments which were essential to give the Henderson Circuit Court jurisdiction of the action.

On August 12, 1949, before answer was filed, appellee amended his petition by adopting the allegations of the original petition and alleging as further grounds for divorce that appellant, for more than six months last past, without fault on his part, had behaved toward him in such a cruel and inhuman manner as to indicate a settled aversion to him and to permanent-

ly destroy his peace and happiness. KRS 403.020(4)(d).

Appellant entered her appearance in the suit by filing answer and counterclaim on September 12, 1949. The first paragraph of her answer was a traverse. The second paragraph contained a counterclaim wherein she alleged as a' ground for divorce that set forth under the provisions of KRS 403.020(4)(d). She also filed a copy of their property settlement which she alleged was executed by her at a time when she was not represented by counsel and had no advice concerning her rights as a wife and had incomplete knowledge of the property and income of her husband. She thereby sought a cancellation of the settlement agreement and asked for an allowance of alimony in the amount of $50,000 a year.

▆ For reversal, it is urged that the judgment of the trial court is void because the evidence established that appellee, at the time he brought this action and at all times prior thereto, was a resident of the state of Maine, and if this be true, the trial court had no jurisdiction of this action. See Civil Code of Practice, Section 423.

▆ Although there is some evidence to the effect that appellee's residence was Lewiston, Maine, yet there was other evidence to show that he had established both a legal residence (domicile) and an actual residence in Henderson, Kentucky, for a sufficient period of time to maintain the action. Therefore, under the evidence, this was a matter within the trial court's jurisdiction to determine and the court having adjudged the fact to be in favor of appellee, it follows that the decree dissolving the marriage contract was not void. Weintraub v. Murphy, Ky., 244 S.W.2d 454, Id., Ky., 240 S.W.2d 594; Lewis v. Lewis, 224 Ky. 18, 4 S.W.2d 1106. Conceding, without deciding, that the judgment is erroneous, this Court has no power to review a judgment granting a divorce to determine whether or not it is merely erroneous. KRS 21.060. Self v. Self, 293 Ky. 255, 168 S.W.2d 743; Winfrey v. Winfrey, 286 Ky. 245, 150 S.W.2d 689; Bushong v. Bushong, 283 Ky. 36, 140 S.W.2d 610. However, this Court does have power to determine whether or not the Chancellor correctly decided the question of alimony and other questions which were raised relating to this subject and to these questions we will now address ourselves. Clay v. Clay, 301 Ky. 547, 191 S.W.2d 819; Rayburn v. Rayburn, 300 Ky. 209, 187 S.W.2d 804.

The record in this case is composed of eight volumes and contains over a thousand pages of testimony. Thereby we have been made thoroughly acquainted with the business, social, and private lives of these parties since 1933.

The evidence disclosed that appellee has owned or operated fifty-six hotels, located geographically from Maine to Louisiana, which has enabled him to accumulate a fortune estimated at $2,500,000. For at least ten years prior to 1943 he had traveled extensively throughout the United States in connection with his hotel businesses and in negotiating for other hotels. He was a single man during these years, having been divorced from his first wife in the nineteen-twenties and did not stay at any one place.

Appellant testified that in 1923 she was married to Robert Sturtevant but that she never lived with him or told anyone about the marriage. She stated that there was no annulment or divorce, but later learned that Sturtevant was dead and that some years later she married another man and was divorced from him prior to her marriage to appellee.

In 1933 appellant began working for appellee as a hostess in his hotels at a salary of $100 a month. From 1938 to 1943, she was not regularly employed although she received pay from appellee or from one or more of his hotels for services that she performed for the hotels. During this period she claims that she was suffering from arthritis. In 1943 appellee married appellant.

About six months prior to their marriage appellee gave appellant $16,000 and suggested that she purchase a home for her mother and to use a part of this sum to buy an engagement ring and her trousseau.

After their marriage she admits that he has given her the following property: Certain notes of the Elmwood Hotel Company, aggregating $40,000; the furniture and fixtures of the Rockland Hotel Company which she sold for $40,000; his interest in the Rockland Hotel Company from which she has received $18,000; and some jewelry, a mink coat and a Cadillac automobile. In addition to these direct gifts she has made over $80,000 by the investment of her funds in business transactions which were negotiated for her by appellee.

The evidence shows that an irreconcilable conflict has existed between them during the major part of their married life. No charge of moral delinquency on the part of either party was made or suggested but their testimony does reveal a multitude of quarrels and disagreements and frequent estrangements which apparently contributed to cause their final separation.

We will now look to the events leading to the preparation and execution of the property settlement contract which was executed by the parties on April 10, 1948, in Louisville, Kentucky.

Both parties agree that the immediate fact which preceded the making of the property settlement was the occasion of her trip to Kentucky from her abode in Florida to view a home in Bardstown, Kentucky. Appellee met her in Nashville and accompanied her to Bardstown. When they arrived in Bardstown, Mrs. Lampkin would not leave the automobile to look at the interior of the house and rejected appellee's offer to purchase the property and refused to live there. Upon his insistance, they proceeded to Louisville that night.

Appellee testified that upon reaching Louisville, he suggested to her some form of property settlement, in view of her fixed intention to return to Florida, particularly that he would give to her the home he owned on Treasure Island, located near Sarasota, Florida, "so that at no time would she ever feel that I might sell it." The next morning they went to the office of Honorable Robert Hobson, an attorney at law, and after some discussion Mr. Hobson prepared a contract which was signed by them as parties and by Mr. Hobson as a witness.

The first five paragraphs of this contract confirm appellant's ownership of property which appellee had theretofore given her, and renounces all his interest therein, except, she agreed that in the event of her death or remarriage prior to appellee's death, the Benwood Hotel property at Effingham, Illinois, "shall revert" to the appellee.

The sixth paragraph of the agreement gave appellant the Treasure Island home, (appellee paid $37,700 for this property) and paragraphs seven and eight obligated appellee to pay appellant $100 a month as long as she lives and also provided for her to receive "up to $2400 a year for medical expenses." Paragraph nine gave her a Cadillac automobile.

The contract further provides:

"In consideration of the above, first party (appellant) does hereby release and forever discharge second party from all interest, rights or claims which she may have, now or hereafter, to any property owned or acquired by second party, (appellee), and for any claim for alimony, maintenance, dower or distributive right, it being the intention of this agreement that each of the parties releases to the other all of such rights."

Appellant testified that there had been no discussion between them about a property settlement and that the first time she knew that it was contemplated by her husband was at the conference in Mr. Hobson's office. She contends that she did not know the value of her husband's estate, nor was she advised concerning her legal right to support and maintenance or what her right of dower would be in Kentucky. She stated that she was not represented by counsel and that when she signed the contract she "was surprised and emotionally upset by the whole performance."

Mr. Robert Hobson testified that the parties came to his office together and told him they had agreed upon a "marriage settlement;" that before he prepared the contract both Mr. and Mrs. Lampkin discussed the status and location of several pieces of property owned by Mr. Lampkin, specifically the Fairhaven property, the Benwood Hotel property, and the home located on Treasure Island. Mr. Hobson stated that there was considerable discussion between Mr. and Mrs. Lampkin concerning the terms of the contract and particularly about the medical expense payments and the monthly allowance which Mrs. Lampkin would receive. Mr. Hobson stated that Mrs. Lampkin talked with him "frankly and composedly as a person could possibly talk" and that he was impressed with the "cold-bloodedness and matter-of-fact" manner she possessed at the time. Mr. Hobson further stated that Mrs. Lampkin said that she did not want Mr. Lampkin's money; that it was a matter of complete indifference to her whether Mr. Lampkin got a divorce and that she stated several times that she knew the nature and extent of Mr. Lampkin's property.

The judgment of divorce granted appellee on the ground of cruel and inhuman treatment is adequately supported by the evidence.

The contract in question was between husband and wife and was not enforceable under the common law. Simpson v. Simpson, 4 Dana 140. However, it has long been established as an equitable doctrine that a contract between husband and wife made in contemplation of the continuance of a previous separation or of an immediate separation, which has for its purpose the adjustment of their respective property rights, will be enforced in equity if the contract was fairly made and just. Edleson v. Edleson, 179 Ky. 300, 200 S.W. 625, 2 A.L.R. 689; Moayon v. Moayon, 114 Ky. 855, 72 S.W. 33, 24 Ky. Law Rep. 1641, 60 L.R.A. 415, 102 Am. St.Rep. 303; also, see, Lewis v. Lewis, Ky., 239 S.W.2d 465; Muth v. Muth, 314 Ky. 531, 236 S.W.2d 469.

The judgment directed each party to pay his own costs incurred in this suit and dismissed the motion of appellant's counsel for an allowance of an attorney's fee to be taxed as costs against appellee. In view of the fact that appellant has an ample estate and inasmuch as the court granted appellee the divorce, the judgment in our opinion is correct. KRS 453.120.

Judgment affirmed.